# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SEBE ALGOFI, BRIAN CASWELL, ELIZA REID, MANUEL MENDOZA, JACQULYN MCGLYNN, TERICA JEROME, ELLIOT FELDBAU, AMY MALCOLM, CHINEDU EKWEOZOH, DENISE LINT; and CAROLYN CLAWSON, on behalf of themselves and all others similarly situated, | **Case No. _____** <br><br> **CLASS ACTION COMPLAINT** |
| *Plaintiffs*, | |
| v. | |
| KONINKLIJKE PHILIPS N.V.; PHILIPS NORTH AMERICA LLC; and PHILIPS RS NORTH AMERICA LLC, | **DEMAND FOR JURY TRIAL** |
| *Defendants*. | |

Plaintiffs Sebe Algofi, Brian Caswell, Eliza Reid, Manuel Mendoza, Jacqulyn McGlynn, Terica Jerome, Elliot Feldbau, Amy Malcolm, Chinedu Ekweozoh, Denise Lint, and Carolyn Clawson ("Plaintiffs"), on behalf of themselves, the class and subclasses of all others similarly situated as defined below, for their complaint against Defendants Koninklijke Philips N.V. ("Royal Philips"), Philips North America LLC ("Philips NA"), and Philips RS North America LLC ("Philips RS") (collectively, Royal Philips, Philips NA, and Philips RS are "Philips" or the "Defendants"), allege the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## INTRODUCTION

1.     Plaintiffs bring this action on behalf of themselves and proposed classes of purchasers and users of Continuous Positive Airway Pressure (CPAP) and Bi-Level Positive Airway Pressure (BiPAP) devices and mechanical ventilators manufactured by Philips, which contain polyester-based polyurethane sound abatement foam ("PE-PUR Foam"). These devices

are commonly used to treat sleep apnea, and ventilators, which treat respiratory failure. In general, all of these devices blow air into patients' airways. CPAP and BiPAP machines are intended for daily use, and ventilators are used continuously while needed. Without these devices, some patients may experience severe symptoms, including heart attack, stroke, and death by asphyxiation.

2.      On April 26, 2021, Philips made a public announcement disclosing it had determined there were risks that the PE-PUR Foam used in certain CPAP, BiPAP, and mechanical ventilator devices it manufactured may degrade or off-gas under certain circumstances.

3.      On June 14, 2021, Philips issued a recall (hereinafter referred to as the "Recall Notice") in the United States of its CPAP, Bi-Level PAP, and mechanical ventilator devices containing PE-PUR Foam, because Philips had determined that (a) the PE-PUR Foam was at risk for degradation into particles that may enter the devices' pathway and be ingested or inhaled by users, and (b) the PE-PUR Foam may off-gas certain chemicals during operation.[1] Philips further disclosed the potential risks of both degradation and chemical exposure include "headache, irritation, inflammation, respiratory issues[,] … hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects."[2]

4.      Philips has disclosed that the absence of visible particles in the devices does not mean that PE-PUR Foam breakdown has not already begun. Philips reported that lab analysis of

---

[1]*Philips issues recall notification\* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices*, PHILIPS (June 14, 2021); https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (Last Accessed July 9, 2021).
[2] *Id.*

the degraded foam reveals the presence of harmful chemicals, including: Toluene Diamine ("TDA"), Toluene Diisocyanate ("TDI"), and Diethylene Glycol ("DEG").[3]

5.      Prior to issuing the Recall Notice, Philips received complaints regarding the presence of black debris/particles within the airpath circuit of its devices (extending from the device outlet, humidifier, tubing, and mask). Philips also received reports of headaches, upper airway irritation, cough, chest pressure and sinus infection from users of these devices.

6.      In its Recall Notice, Philips disclosed that the potential risks of particulate exposure to users of these devices include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver), and toxic carcinogenic affects. The potential risks of chemical exposure due to off-gassing of PE-PUR Foam in these devices include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

7.      In the Recall Notice, Philips recommended that patients using the recalled CPAP and BiPAP devices immediately discontinue using their devices and that patients using the recalled ventilators for life-sustaining therapy consult with their physicians regarding alternative ventilator options.

8.      Each of the Plaintiffs received confirmation that their respective CPAP devices were subject to recall. As a result, Plaintiffs purchased and paid good money for products that are worthless and dangerous.

9.      Plaintiffs seek to recover damages based on, *inter alia*, Philips' breach of express warranty, breach of implied warranties, misrepresentations, omissions, and breaches of state

---

[3] Philips Sleep and Respiratory Care Update; Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed June 27, 2021).

consumer protection laws in connection with its manufacture, marketing and sales of devices containing PE-PUR Foam on behalf of themselves and the proposed Class Members. In addition, Plaintiffs seek medical monitoring damages for users of Philips' devices identified in the Recall Notice, who are at risk of suffering from serious injury, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic affects.

## **PARTIES**

10.     Unless otherwise indicated, all Plaintiffs identified below purchased and used the CPAP devices for personal use as they related to a sleep apnea diagnosis. All Plaintiffs were harmed and suffered damages.

11.     For ease of reference, the following chart identifies and organizes the individual and respective Plaintiffs by the state in which they purchased or used the Recalled Devices (defined below):

| | |
|---|---|
| Sebe Algofi | New York |
| Brian Caswell | Indiana |
| Eliza Reid | California |
| Manuel Mendoza and Jacqulyn McGlynn | Texas |
| Terica Jerome | Alabama |
| Elliot Feldbau | Massachusetts |
| Amy Malcolm | Missouri |
| Chinedu Ekweozoh | Maryland |
| Denise Lint and Carolyn Clawson | Pennsylvania |

***New York Plaintiff, Sebe Algofi***

12.    Plaintiff Sebe Algofi resides in Brooklyn, New York and is thirty years old. Plaintiff purchased the CPAP device on or about August 1, 2019 from an online retailer.

13.    Plaintiff Algofi first began experiencing symptoms on September 21, 2019. Plaintiff Algofi's symptoms included headaches, irritation, and nausea and vomiting. Plaintiff Algofi is not a smoker.

14.    Plaintiff Algofi, who suffered from headaches, irritation, and nausea and vomiting, would not have purchased the CPAP device if he had known it was defective.

15.    Plaintiff Algofi is seeking a refund, replacement with a non-defective device, and costs for ongoing medical monitoring, and all other appropriate damages for all the injuries he has suffered as a result of the defective CPAP device.

***Indiana Plaintiff, Brian Caswell***

16.    Plaintiff Brian Caswell resides in Evansville, IN and is fifty-four years old. Plaintiff purchased the CPAP device in 2019 from Anderson Medical Equipment in Terre Haute, IN.

17.    Plaintiff Caswell first began experiencing symptoms on May 1, 2020. Plaintiff Caswell's symptoms included headaches, inflammation, irritation, and respiratory issues. Plaintiff Caswell is not a smoker.

18.    Plaintiff Caswell sought treatment for his symptoms on July 1, 2020 with a treating physician. As of the filing of this complaint, Plaintiff Caswell's treatment is ongoing. Plaintiff, who suffered from headaches, inflammation, irritation, and respiratory issues would not have purchased the CPAP device if he had known it was defective.

19.     Plaintiff Caswell is seeking a seeking a refund, replacement with a non-defective device, and costs for ongoing medical monitoring, and all other appropriate damages for all the injuries he has suffered as a result of the defective CPAP device.

*California Plaintiff, Eliza Reid*

20.     Plaintiff Eliza Reid resides in Mojave, California and is fifty-two old. Plaintiff purchased the CPAP device from www.usa.philips.com.

21.     Plaintiff Reid first began experiencing symptoms on February 21, 2019. Her symptoms included headaches, irritation, and nausea and vomiting. Plaintiff Reid is not a smoker.

22.     Plaintiff Reid sought treatment for her symptoms on April 23, 2019 with a treating physician. Plaintiff Reid, who suffered from headaches, irritation, and nausea and vomiting, would not have purchased the CPAP device if she had known it was defective.

23.     Plaintiff Reid is seeking a refund, replacement with a non-defective device, and costs for ongoing medical monitoring, and all other appropriate damages for all the injuries she has suffered as a result of the defective CPAP device.

*Texas Plaintiff, Manuel Mendoza*

24.     Plaintiff Manuel Mendoza resides in La Porte, Texas and is fifty-six years old. Plaintiff Mendoza purchased the CPAP device in 2013-2014 from Active American Mobility and Medical Supply in Stafford, Texas.

25.     Plaintiff Mendoza first began experiencing symptoms on April 14, 2013. His symptoms included headaches, irritation, nausea and vomiting, and respiratory issues. Plaintiff Mendoza is not a smoker.

26.     Plaintiff Mendoza sought treatment for his symptoms on April 13, 2013 with a treating physician. Plaintiff, who suffered from headaches, irritation, nausea and vomiting, and respiratory issues would not have purchased the CPAP device if he had known it was defective.

27.     Plaintiff Mendoza is seeking a refund, replacement with a non-defective device, and costs for ongoing medical monitoring, and all other appropriate damages for all the injuries he has suffered as a result of the defective CPAP device.

***Texas Plaintiff, Jacqulyn McGlynn***

28.     Plaintiff Jacqulyn McGlynn resides in Tyler, Texas and is seventy-two years old. Plaintiff purchased the CPAP device on October 2, 2018 from CPS Medical, Inc. in Tyler, Texas.

29.     Plaintiff McGlynn first began experiencing symptoms on December 20, 2018. Her symptoms included headaches, inflammation, and irritation. Plaintiff McGlynn is not a smoker.

30.     Plaintiff McGlynn, who suffered from headaches, inflammation, and irritation, would not have purchased the CPAP device if she had known it was defective.

31.     Plaintiff McGlynn is seeking a refund, replacement with a non-defective device, and costs for ongoing medical monitoring, and all other appropriate damages for all the injuries she has suffered as a result of the defective CPAP device.

***Alabama Plaintiff, Terica Jerome***

32.     Plaintiff Terica Jerome resides in Wetumpka, Alabama and is forty years old. Plaintiff Jerome purchased the CPAP device in 2019 or 2020 from American Home Patient.

33.     Plaintiff Jerome first began experiencing symptoms on August 23, 2020. Her symptoms included headaches, inflammation, irritation, nausea and vomiting, and respiratory issues. Plaintiff Jerome is not a smoker.

34.     Plaintiff Jerome sought treatment for her symptoms on August 25, 2020 with a treating physician. Plaintiff Jerome, who suffered from headaches, inflammation, irritation, nausea and vomiting, and respiratory issues would not have purchased the CPAP device if she had known it was defective.

35.     Plaintiff Jerome is seeking a refund, replacement with a non-defective device, and costs for ongoing medical monitoring, and all other appropriate damages for all the injuries she has suffered as a result of the defective CPAP device.

***Massachusetts Plaintiff, Elliot Feldbau***

36.     Plaintiff Elliot Feldbau resides in North Easton, Massachusetts and is seventy-six years old. Plaintiff Feldbau purchased the CPAP device approximately three-four years ago from North Atlantic Regional Home Care.

37.     Plaintiff Feldbau first began experiencing symptoms on April 1, 2021. His symptoms included an increase in allergy-like symptoms. Plaintiff Feldbau is not a smoker.

38.     Plaintiff Feldbau, now suffering from an increase in allergy-like symptoms, would not have purchased the CPAP device if he had known it was defective.

39.     Plaintiff Feldbau is seeking a refund, replacement with a non-defective device, and costs for ongoing medical monitoring, and all other appropriate damages for all the injuries he has suffered as a result of the defective CPAP device.

***Missouri Plaintiff, Amy Malcolm***

40.     Plaintiff Amy Malcolm resides in Peculiar, Missouri and is forty-three years old. Plaintiff Malcolm purchased the CPAP device in 2019 from her doctor's office.

41.     Plaintiff Malcolm first began experiencing symptoms after using the CPAP device. Her symptoms included headaches.

42.     Plaintiff Malcolm, who suffered from headaches would not have purchased the CPAP device if she had known it was defective.

43.     Plaintiff Malcolm is seeking a refund, replacement with a non-defective device, and costs for ongoing medical monitoring, and all other appropriate damages for all the injuries she has suffered as a result of the defective CPAP device.

### Maryland Plaintiff, Chinedu Ekweozoh

44.     Plaintiff Chinedu Ekweozoh resides in Oxon Hill, Maryland and is forty-six years old. Plaintiff purchased the CPAP device in June 2020 from Sleep Coordinator in Greenbelt, Maryland.

45.     Plaintiff Ekweozoh first began experiencing symptoms on December 1, 2020. His symptoms included headaches, irritation, and respiratory issues.

46.     Plaintiff Ekweozoh sought treatment for respiratory conditions on December 20, 2020 with a treating physician. Plaintiff Ekweozoh, who suffered from headaches, irritation, and respiratory issues, would not have purchased the CPAP device if he had known it was defective.

47.     Plaintiff Ekweozoh is seeking a refund, replacement with a non-defective device, and costs for ongoing medical monitoring, and all other appropriate damages for all the injuries he has suffered as a result of the defective CPAP device.

### Pennsylvania Plaintiff, Denise Lint

48.     Plaintiff Denise Lint resides in Dunbar, Pennsylvania. Plaintiff purchased the CPAP Device in September 2020.

49.     Plaintiff Lint first began experiencing symptoms shortly after she purchased the CPAP device in September 2020. Her symptoms included increased exhaustion, shortness of breath, chest pains, and hypoxemia.

50.     Plaintiff Lint sought treatment for her symptoms from October 2021 onwards with a series of treating physicians. As of the filing of this complaint, her symptoms are ongoing and Plaintiff Lint was diagnosed with hypersensitivity pneumonitis. Plaintiff Lint, now suffering from exhaustion, shortness of breath, chest pains and hypoxemia, and with a diagnosis of hypersensitivity pneumonitis, would not have purchased the CPAP device if she had known it was defective.

51.     Plaintiff Lint is seeking a refund, replacement with a non-defective device, and costs for ongoing medical monitoring, and all other appropriate damages for all the injuries she has suffered as a result of the defective CPAP device.

### Pennsylvania Plaintiff, Carolyn Clawson

52.     Plaintiff Carolyn Clawson resides in Indiana, Pennsylvania. Plaintiff purchased the CPAP device the in 2016 or 2017.

53.     Plaintiff Clawson first began experiencing symptoms shortly after using her CPAP device. Her symptoms included frequent and long-lasting sinus infections, bronchitis, nasal congestion, as well as nasal pain, headaches, and pressure.

54.     Plaintiff Clawson sought treatment for her symptoms shortly after they began with a treating physician and emergency clinics. Plaintiff Clawson, who suffered from frequent and long-lasting sinus infections, bronchitis, nasal congestion, as well as nasal pain, headaches, and pressure would not have purchased the CPAP device if she had known it was defective.

55.     Plaintiff Clawson is seeking a refund, replacement with a non-defective device, and costs for ongoing medical monitoring, and all other appropriate damages for all the injuries she has suffered as a result of the defective CPAP device.

56.     Defendant Royal Philips is a Dutch multinational corporation with its principal place of business located in Amsterdam, Netherlands. Royal Philips is the parent company of the Philips Group of healthcare technology businesses, including Connected Care businesses focusing on Sleep & Respiratory Care. Royal Philips holds directly or indirectly 100% of its subsidiaries Philips NA and Philips RS.[4] Upon information and belief, Royal Philips controls Philips NA and Philips RS in the manufacturing, selling, distributing, and supplying of the recalled CPAP, BiPAP, and mechanical ventilator devices.[5]

57.     Defendant Philips NA is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA is a wholly-owned subsidiary of Royal Philips.

58.     Defendant Philips RS is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15206. Philips RS is a wholly-owned subsidiary of Royal Philips. Philips RS was formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.[6]

---

[4] Philips 2020 annual filing with the SEC, fn. 8,
https://www.sec.gov/Archives/edgar/data/313216/000031321621000008/phg-exhibit8.htm (accessed June 30, 2021).

[5] Philips 2020 annual filing with the SEC,
https://www.sec.gov/ix?doc=/Archives/edgar/data/0000313216/000031321621000008/phg-20201231.htm (accessed June 30, 2021).

[6] Philips announces completion of tender offer to acquire Respironics, WEB WIRE,
https://www.webwire.com/ViewPressRel.asp?aId=61199 (accessed June 27, 2021).

## JURISDICTION AND VENUE

59.     This Court has subject matter jurisdiction over this class action pursuant to 28

U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in

controversy exceeds $5 million, exclusive of interest and costs, and is a class action in which

Plaintiffs and some members of the Class are citizens of states different than Defendants. See 28

U.S.C. § 1332(d)(2)(A).

60.     Venue is proper in this District because Philips North America LLC is

headquartered in this District and because a substantial part of the events or omissions giving rise

to the claim occurred in this District.

61.     The Court has personal jurisdiction over the Defendants because Defendants

conduct substantial business in this District, and the events giving rise to Plaintiffs' claims arise

out of and relate to Defendants' contacts with this District. Moreover, Defendant Philips RS has

its principal place of business in the Commonwealth. Defendants Philips RS and Philips NA are

controlled by their parent Royal Philips. Defendants' affiliations with this District are so

continuous and systematic as to render them essentially at home in the Commonwealth. Further,

Defendants have transacted business, maintained substantial contacts, purposefully targeted

consumers and medical professionals for sales of its devices and/or committed overt acts in

furtherance of the unlawful acts alleged in this Complaint in this District, as well as throughout

the United States. The unlawful acts of Defendants have been directed at, targeted, and have had

the effect of causing injury to persons residing in, located in, or doing business in this District, as

well as throughout the United States.

## FACTUAL BACKGROUND

### I.    Continuous Positive Airway Pressure Therapy

62.    Continuous Positive Airway Pressure ("CPAP") therapy is a common nonsurgical treatment primarily used to treat sleep apnea. CPAP therapy typically involves the use of a hose and a nasal or facemask device that delivers constant and steady air pressure to an individual's throat to help individuals breathe.

63.    Sleep apnea is a common sleep disorder characterized by repeated interruptions in breathing throughout an individual's sleep cycle. These interruptions, called "apneas," are caused when the soft tissue in an individual's airway collapses. The airway collapse prevents oxygen from reaching the individual's lungs which can cause a buildup of carbon dioxide. If the individual's brain senses the buildup of carbon dioxide, it will briefly rouse the individual from sleep so that the individual's airway can reopen. Often, these interruptions are so brief that the individual will not remember. Despite the brevity of the interruptions, the sleep cycle disruption caused by sleep apnea can dramatically impact a person's lifestyle, including negatively impacting energy, mental performance, and long-term health. CPAP therapy helps treat sleep apnea by preventing the person's airway from collapsing while breathing during sleep cycles, which can help prevent interruptions in breathing.

### II.    Bi-Level Positive Airway Pressure Therapy

64.    Bi-Level Positive Airway Pressure ("BiPAP") therapy is a common alternative to CPAP therapy for treating sleep apnea. Similar to CPAP therapy, BiPAP therapy is nonsurgical and involves the use of a nasal or facemask device to maintain air pressure in an individual's airway. BiPAP therapy is distinguishable from CPAP therapy because BiPAP devices deliver two alternating levels—inspiratory and expiratory—of pressurized air into a person's airway,

rather than the single continuous level of pressurized air delivered by a CPAP device. The inspiratory positive airway pressure assists a person as a breath is taken in. Conversely, the expiratory positive airway pressure is applied to allow a person to comfortably breathe out. BiPAP devices deliver one level of pressurize air (the inspiratory positive level) to assist as a person inhales, and another level (the expiratory level) as a person exhales.

### III.    Mechanical Ventilation

65.    Mechanical ventilation is a treatment to help people breathe when they find it difficult or are unable to breathe on their own. A mechanical ventilator pushes airflow into the patient's lungs to help them breathe. Mechanical ventilation may be invasive ventilation with a tube inserted into the patient's airway, performed in the intensive care unit in the hospital or a long-term institutional setting. Non-invasive ventilation can be used at home by people with respiratory difficulties.

## SUBSTANTIVE ALLEGATIONS

66.    Philips developed, marketed, and sold a variety of CPAP and BiPAP respirator devices and mechanical ventilators under its "Sleep & Respiratory Care" segment of its business designed to assist individuals with a number of sleep, breathing, and respiratory conditions, including obstructive sleep apnea, central sleep apnea, complex sleep apnea syndrome, and Chronic Obstructive Pulmonary Disease (COPD), as well as to assist those individuals requiring invasive and non-invasive ventilators for acute and sub-acute hospital environments. Philips' CPAP and BiPAP respirator devices and its mechanical ventilators typically cost several hundred, if not thousands of dollars. Philips has sold millions of these devices in the United States.

## I.    Philips Sleep & Respiratory Care Devices Endangered Users

67.    On April 26, 2021, in its Quarterly Report for Q1 2021, Philips disclosed for the first time, under a section entitled "Regulatory Update," that device user reports had led to a discovery that the type of PE-PUR Foam Philips used to minimize noise in several CPAP and BiPAP respirators and mechanical ventilators posed health risks to its users. Specifically, Philips disclosed that "the [PE-PUR] foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone[], and certain environmental conditions involving high humidity and temperature."[7]

68.    Seven weeks later, on June 14, 2021, Philips announced a recall of numerous models of CPAP and BiPAP devices, as well as a variety of its mechanical ventilators "to address identified potential health risks related to the polyester-based polyurethane (PE-PUR) sound abatement foam component in these devices."[8] Specifically, Philips announced that it had determined that the "PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals."[9] In total, Philips announced that "[b]etween 3 million and 4 million" devices are targeted in the recall.[10]

---

[7] First Quarter Results, PHILIPS (Apr. 26, 2021), https://www.results.philips.com/publications/q121/downloads/pdf/en/philips-first-quarter-results-2021-report.pdf (accessed June 27, 2021).

[8] *Philips issues recall notification* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices*, PHILIPS (June 14, 2021), https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (accessed June 27, 2021).

[9] *Id.*

[10] Associated Press, *Philips recalls ventilators, sleep apnea machines due to health risks*, NBC NEWS, https://www.nbcnews.com/business/consumer/philips-recalls-ventilators-sleep-apnea-machines-due-health-risks-n1270725 (accessed June 27, 2021).

69.    The list of the devices recalled by Philips (the "Recalled Devices") include:

| Philips CPAP and BiPAP Devices Manufactured Before April 26, 2021 Subject to Recall[11] | |
|---|---|
| Device Name/Model Type | Type |
| E30 (Emergency Use Authorization) | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| DreamStation ASV | Continuous Ventilator, Non-life Supporting |
| DreamStation ST, AVAPS | |
| SystemOne ASV4 | |
| C Series ASV | |
| C Series S/T and AVAPS | |
| OmniLab Advanced Plus | |
| SystemOne (Q Series) | Non-continuous Ventilator |
| DreamStation | |
| DreamStation GO | |
| Dorma 400 | |
| Dorma 500 | |
| REMStar SE Auto | |

| Philips Mechanical Respirator Devices Manufactured Before April 26, 2021 Subject to Recall[12] | |
|---|---|
| Device Name/Model Type | Type |
| Trilogy 100 Ventilator | Continuous Ventilator |
| Trilogy 200 Ventilator | |
| Garbin Plus, Aeris, LifeVentVentilator | |
| A-Series BiPAP Hybrid A30 | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| Philips A-Series BiPAP V30 Auto | |
| Philips A-Series BiPAP A40 | Continuous Ventilator, Non-life Supporting |
| Philips A-Series BiPAP A30 | |

[11] *See* Medical Device recall notification (U.S. only) / field safety notice (International Markets), PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (accessed June 27, 2021); Royal Philips Update on the recall notification, https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (accessed June 27, 2021).

[12] *Id.*

70.     According to Philips, the PE-PUR Foam used in Recalled Devices put users at risk of suffering from: "[i]rritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g. kidneys and liver) and toxic carcinogenic affects."[13]

71.     Philips reported to physicians that PE-PUR Foam particles "may cause irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve."[14]

72.     Further, Philips reported that "based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment."[15]

73.     Philips announced that it has received reports of "patient impact" in the Recalled Devices, and announced risks of exposure as including "headache, irritation, inflammation, and respiratory issues."[16]

---

[13] *Id.*

[14] Philips *Sleep and Respiratory Care Update – Clinical information for physicians*, June 14, 2021, philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed June 27, 2021).

[15] *Id.*

[16] *Philips issues recall notification\* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices*, PHILIPS (June 14, 2021); https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (last accessed July 9, 2021).

## II.    **The Health Risks Associated with Use of the Recalled Devices Renders Them Worthless**

74.    As a result of the health risks associated with the use of the Recalled Devices, the Recalled Devices have been rendered completely worthless or, at the very least, have been substantially diminished in value.

75.    The information described above, including the now-known health risks of Philips CPAP devices, BiPAP devices and mechanical ventilators, the recall, and the medical warnings and advice issued by Philips, have rendered the Recalled Devices worthless to patients with sleep apnea and respiratory conditions. Individuals not using life-supporting ventilators should immediately discontinue their user of the Recalled Devices or face serious health risks as grave as organ failure or cancer. If they choose to discontinue use of the Recalled Devices, they must pay for another expensive device in order to receive effective treatment for their sleep apnea and/or respiratory conditions. Individuals using life-supporting ventilators must seek an alternative treatment before discontinuing use of the Recalled Devices.

76.    Recognizing this, Philips issued the following advice to patients using any of the Recalled Devices:

- "**For patients using BiLevel PAP and CPAP devices:** Discontinue use of affected units and consult with physicians to determine the benefits of continuing therapy and potential risks."[17]

- "**For patients using life-sustaining mechanical ventilator devices: DO NOT discontinue or alter prescribed therapy, without consulting physicians to determine appropriate next steps.**"[18]

---

[17] Medical Device recall notification (U.S. only) / field safety notice (International Markets), PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (accessed June 27, 2021) (Questions and answers) (emphasis in original).

[18] *Id.*

77.     As a result of the above, Plaintiffs and the Class Members will have to undertake considerable expense replacing the Recalled Devices.

### III.     Philips Unreasonably Delayed its Recall

78.     At no time prior to its Regulatory Update on April 26, 2021, did Philips disclose to purchasers or users of the Recalled Devices that the PE-PUR Foam contained therein may off-gas or degrade upon use. Similarly, prior to the Update, Philips did not disclose any health risks associated with use of the Recalled Devices.

79.     Defendants have not disclosed when they first discovered or received reports from users of their Sleep & Respiratory Care devices "regarding degrade[d]… particles which may enter the device's air pathway and be ingested or inhaled by the user…"[19]

80.     At a minimum, as a result of user reports, Defendants were aware of the off-gassing and degradation of the PE-PUR Foam used in the Recalled Devices at some point prior to the recall, yet continued to manufacture and sell the Recalled Devices with such awareness. During this period, Defendants unreasonably and unjustly profited from the manufacture and sale of the Recalled Devices and unreasonably put users of the Recalled Devices at risk of development of serious adverse health effects, including organ failure and cancer.

### TOLLING AND ESTOPPEL

### I.     DISCOVERY RULE TOLLING

81.     Plaintiffs and the Class Members had no way of knowing about Philips' conduct with respect to the health risks associated with the use of the Recalled Devices.

---

[19] *Philips issues recall notification\* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices*, PHILIPS (June 14, 2021); https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (Last Accessed July 9, 2021).

82.     Neither Plaintiffs nor any other members of the Classes, through the exercise of reasonable care, could have discovered the conduct by Philips alleged herein. Further, Plaintiffs and members of the Class and Subclass did not discover and did not know of facts that would have caused a reasonable person to suspect that Philips was engaged in the conduct alleged herein.

83.     For these, reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiffs, the Class, and Subclass.

## II.     FRAUDULENT CONCEALMENT TOLLING

84.     By failing to provide immediate notice of the adverse health effects associated with continued use of the Recalled Devices, Philips concealed its conduct and the existence of the claims asserted herein from Plaintiff and the members of the Class and Subclass.

85.     Upon information and belief, Philips intended its acts to conceal the facts and claims from Plaintiff and members of the Class and Subclass. Plaintiff and the members of the Class and Subclass were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiffs or members of the Classes should be tolled.

## CLASS ACTION ALLEGATIONS

86.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). Plaintiffs seek class certification on behalf of a class defined as follows (the "Class"):

> **NATIONWIDE CLASS**: All persons in the United States who purchased or used a CPAP, BiPAP, or Mechanical Ventilator device that was manufactured by Philips before April 26, 2021, and recalled by Philips on June 14, 2021.

87.     In addition to a Nationwide Class, Plaintiff Algofi seeks certification on behalf of

a subclass defined as follows (the "New York Subclass"):

**NEW YORK SUBCLASS**: All persons who were or are citizens of the State of
New York who purchased or used a CPAP, BiPAP, or Mechanical Ventilator
device that was manufactured by Philips before April 26, 2021, and recalled by
Philips on June 14, 2021.

88.     In addition to a Nationwide Class, Plaintiff Caswell seeks certification on behalf

of a subclass defined as follows (the "Indiana Subclass"):

**INDIANA SUBCLASS**: All persons who were or are citizens of the State of
Indiana who purchased or used a CPAP, BiPAP, or Mechanical Ventilator device
that was manufactured by Philips before April 26, 2021, and recalled by Philips
on June 14, 2021.

89.     In addition to a Nationwide Class, Plaintiff Reid seeks certification on behalf of a

subclass defined as follows (the "California Subclass"):

**CALIFORNIA SUBCLASS**: All persons who were or are citizens of the State of
California who purchased or used a CPAP, BiPAP, or Mechanical Ventilator
device that was manufactured by Philips before April 26, 2021, and recalled by
Philips on June 14, 2021.

90.     In addition to a Nationwide Class, Plaintiffs Mendoza and McGlynn seek

certification on behalf of a subclass defined as follows (the "Texas Subclass"):

**TEXAS SUBCLASS**: All persons who were or are citizens of the State of Texas
who purchased or used a CPAP, BiPAP, or Mechanical Ventilator device that was
manufactured by Philips before April 26, 2021, and recalled by Philips on June
14, 2021.

91.     In addition to a Nationwide Class, Plaintiff Jerome seeks certification on behalf of

a subclass defined as follows (the "Alabama Subclass"):

**ALABAMA SUBCLASS**: All persons who were or are citizens of the State of
Alabama who purchased or used a CPAP, BiPAP, or Mechanical Ventilator
device that was manufactured by Philips before April 26, 2021, and recalled by
Philips on June 14, 2021.

92.     In addition to a Nationwide Class, Plaintiff Feldbau seeks certification on behalf

of a subclass defined as follows (the "Massachusetts Subclass"):

> **MASSACHUSETTS SUBCLASS**: All persons who were or are citizens of the
> State of Massachusetts who purchased or used a CPAP, BiPAP, or Mechanical
> Ventilator device that was manufactured by Philips before April 26, 2021, and
> recalled by Philips on June 14, 2021.

93.     In addition to a Nationwide Class, Plaintiff Malcolm seeks certification on behalf

of a subclass defined as follows (the "Missouri Subclass"):

> **MISSOURI SUBCLASS**: All persons who were or are citizens of the State of
> Missouri who purchased or used a CPAP, BiPAP, or Mechanical Ventilator
> device that was manufactured by Philips before April 26, 2021, and recalled by
> Philips on June 14, 2021.

94.     In addition to a Nationwide Class, Plaintiff Ekweozoh seeks certification on

behalf of a subclass defined as follows (the "Maryland Subclass"):

> **MARYLAND SUBCLASS**: All persons who were or are citizens of the State of
> Maryland who purchased or used a CPAP, BiPAP, or Mechanical Ventilator
> device that was manufactured by Philips before April 26, 2021, and recalled by
> Philips on June 14, 2021.

95.     In addition to a Nationwide Class, Plaintiffs Lint and Clawson seek certification

on behalf of a subclass defined as follows (the "Pennsylvania Subclass"):

> **PENNSYLVANIA SUBCLASS**: All persons who were or are citizens of the
> State of Pennsylvania who purchased or used a CPAP, BiPAP, or Mechanical
> Ventilator device that was manufactured by Philips before April 26, 2021, and
> recalled by Philips on June 14, 2021.

96.     Plaintiffs reserve the right to modify or refine the definitions of the Class or

Subclasses based upon discovery of new information and in order to accommodate any of the

Court's manageability concerns.

97.     Excluded from the Class and Subclasses are: (a) any Judge or Magistrate Judge

presiding over this action and members of their staff, as well as members of their families; (b)

Defendants' and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendants or their parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class or Subclasses; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

98.    **Numerosity (Rule 23(a)(1))**. The members of the Class and Subclass are so numerous that joinder of individual members herein is impracticable. The exact number of members of the Class and Subclass, as herein identified and described, is not known, but sales figures and the Recall Notice indicate that millions of individuals have purchased the Recalled Devices.

99.    **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclasses members, including the following:

- whether Defendants owed a duty of care to Plaintiffs and the Class and Subclasses;

- whether Defendants knew or should have known that the PE-PUR Foam used for sound abatement posed health risks;

- whether Defendants wrongfully represented that the PE-PUR Foam used for sound abatement in the Recalled Devices was safe;

- whether the Recalled Devices retained any value post-recall;

- whether Defendants wrongfully represented that the Recalled Devices were safe to use;

- whether Defendants wrongfully failed to disclose that the PE-PUR Foam used for sound abatement in the Recalled Devices posed health risks to Recalled Device users;

- whether Defendants' representations and omissions in advertising, packaging, and/or labeling were false, deceptive, and/or misleading;

- whether those representations and omissions were likely to deceive a reasonable consumer;

- whether a reasonable consumer would consider the presence, or risk of, health risks as a material fact in purchasing one of the Recalled Devices;

- whether Defendants had knowledge that those representations and omissions were false, deceptive, and misleading;

- whether Defendants engaged in unfair trade practices;

- whether Defendants engaged in false advertising;

- whether Defendants' conduct was negligent per se;

- whether Defendants made negligent and/or fraudulent misrepresentations and/or omissions; and

- whether Plaintiffs and the members of the Class and Subclasses are entitled to actual, statutory, and punitive damages.

100.    **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of the other members of the proposed Class and Subclasses. Plaintiffs and members of the Class and

Subclass (as applicable) suffered injuries as a result of Defendants' wrongful conduct that is uniform across the Class and Subclasses.

101.    **Adequacy (Rule 23(a)(4))**. Plaintiffs' interests are aligned with the Class and Subclass that they seek to represent. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the members of the Class and Subclasses. Plaintiffs have retained competent counsel highly experienced in complex litigation and class actions and the types of claims at issue in this litigation, with the necessary resources committed to protecting the interests of the Class and Subclasses. Plaintiffs have no interests that are antagonistic to those of the Class and Subclasses, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and Subclass. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Class and Subclasses.

102.    **Superiority**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class and Subclasses is impracticable. The prosecution of separate actions by individual members of the Class and Subclasses would impose heavy burdens upon the Courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class and Subclasses, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

103.    **Manageability.** This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

104.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### FRAUDULENT MISREPRESENTATION
**(On behalf of the Nationwide Class or, alternatively, the Subclasses)**

105.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

106.    Philips failed to advise Plaintiffs and the Class and Subclasses that the Recalled Devices posed serious health risks to their users and Philips falsely represented to Plaintiffs and the Class and Subclasses that the Recalled Devices were safe for human use.

107.    Philips intentionally, knowingly, and recklessly made these misrepresentations and omissions to induce Plaintiffs and the Class and Subclasses to purchase the Recalled Devices.

108.    Philips knew that its representations and omissions about the Recalled Devices were false in that the Recalled Devices contained PE-PUR Foam and thus were at risk of causing adverse health effects to users of the Recalled Devices, which does not conform to the products' labels, packaging, advertising, and statements. Philips knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs and the Class and Subclasses.

109.    Plaintiffs and the Class and Subclasses did in fact rely on these omissions and misrepresentations and purchased and used the Recalled Devices to their detriment. Given the deceptive manner in which Philips advertised, represented, and otherwise promoted the Recalled Devices, Plaintiffs' and the Class' and Subclasses' reliance on Philips' omissions and misrepresentations was justifiable.

110.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Class and Subclasses have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks, including organ failure and cancer, associated with the use of the Recalled Devices, and (c) which did not conform to the Recalled Devices' labels, packaging, advertising, and statements.

111.    Plaintiffs and the Class and Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

## SECOND CLAIM FOR RELIEF
### FRAUD BY OMISSION
**(On behalf of Nationwide Class or, alternatively, the Subclasses)**

112.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

113.    Philips concealed from and failed to disclose to Plaintiffs and the Class and Subclasses that use of Recalled Devices is accompanied by a risk of adverse health effects, which does not conform to the products' labels, packaging, advertising, and statements.

114.    Philips was under a duty to disclose to Plaintiffs and the Class and Subclasses the true quality, characteristics, ingredients and suitability of the Recalled Devices because: (a) Philips was in a superior position to know the true state of facts about its products; (b) Philips was in a superior position to know the risks associated with the use of, characteristics of, and

suitability of the Recalled Devices for use by individuals; and (c) Philips knew that Plaintiffs and the Class and Subclass could not reasonably have been expected to learn or discover prior to purchasing the Recalled Devices that there were misrepresentations and omissions by Philips in the packaging, labels, advertising, and websites regarding the health risks associated with use of these devices.

115.    The facts concealed or not disclosed by Philips to Plaintiffs and the Class and Subclasses were material in that a reasonable consumer would have considered them important when deciding whether to purchase the Recalled Devices.

116.    Plaintiffs and the Class and Subclasses justifiably relied on Philips' omissions to their detriment. The detriment is evident from the true quality, characteristics, and risk associated with the use of the Recalled Devices, which is inferior when compared to how the Recalled Devices are advertised and represented by Philips.

117.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Class and Subclasses have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks associated with the use of the Recalled Devices, and (c) which do not conform to the Recalled Devices' labels, packaging, advertising, and statements.

118.    Plaintiffs and the Class and Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

### THIRD CLAIM FOR RELIEF
### NEGLIGENT MISREPRESENTATION
**(On behalf of the Nationwide Class or, alternatively, the Subclasses)**

119.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

28

120.    Philips had a duty to Plaintiffs and the Class and Subclasses to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, distribution, and sale of the Recalled Devices.

121.    Philips breached its duty to Plaintiffs and the Class and Subclasses by developing, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiff and the Class and Subclass that did not have the qualities, characteristics, and suitability for use as advertised by Philips and by failing to promptly remove the Recalled Devices from the marketplace or to take other appropriate remedial action upon becoming aware of the health risks of the Recalled Devices.

122.    Philips knew or should have known that the qualities and characteristics of the Recalled Devices were not as advertised or suitable for their intended use and were otherwise not as warranted and represented by Philips. Specifically, Philips knew or should have known that: (a) the use of the Recalled Devices was accompanied by risk of adverse health effects that do not conform to the packaging and labeling; (b) the Recalled Devices were adulterated, or at risk of being adulterated, by the PE-PUR Foam; and (c) the Recalled Devices were otherwise not as warranted and represented by Philips.

123.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Class and Subclasses have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known they contained PE-PUR Foam that could cause users of the Recalled Devices to suffer adverse health effects, and (c) which do not conform to the products' labels, packaging, advertising, and statements.

124.    Plaintiffs and the Class and Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available.

### FOURTH CLAIM FOR RELIEF
**UNJUST ENRICHMENT**
**(On behalf of the Nationwide Class or, alternatively, the Subclasses)**

125.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

126.    Plaintiffs and the Class and Subclasses conferred substantial benefits on Philips through their purchase of the Recalled Devices. Philips knowingly and willingly accepted and enjoyed these benefits.

127.    Philips either knew or should have known that the payments rendered by Plaintiffs and the Class and Subclasses were given with the expectation that the Recalled Devices would have the qualities, characteristics, and suitability for use represented and warranted by Philips. As such, it would be inequitable for Philips to retain the benefit of the payments under these circumstances.

128.    Philips' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Philips to retain the benefits without payment of the value to Plaintiffs and the Class and Subclasses.

129.    Plaintiffs and the Class and Subclasses are entitled to recover from Philips all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

130.    Plaintiffs and the Class and Subclasses seek actual damages, attorneys' fees, costs, and any other just and proper relief available under the laws.

**FIFTH CLAIM FOR RELIEF**
**Violations of the New York Deceptive Trade Practices Act**
**New York Gen. Bus. Law § 349, et seq.**
**(On behalf of the New York Subclass, except for Class Members who purchased a Recalled**
**Device for business use only)**

131.    Plaintiff Algofi incorporates the foregoing allegations as if fully set forth herein.

132.    Plaintiff Algofi brings this claim on behalf of himself and the New York Subclass.

133.    The New York Deceptive Acts and Practices Act makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

134.    Defendants engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, as described herein.

135.    Defendants' foregoing acts and practices, including its omissions, were directed at consumers.

136.    Defendants' representations and omissions were material, in part, because they concerned an essential part of the Recalled Devices' functionality and safety, and also because they were likely to deceive reasonable consumers.

137.    Defendants' foregoing deceptive acts and practices, including their omissions, were and are deceptive acts or practices in violation of New York's General Business Law section 349, Deceptive Acts and Practices, N.Y. Gen. Bus. Law 349, et. seq., in that:

a.    Defendants represented to Plaintiff Algofi and the New York Subclass that the Recalled Devices had approval or characteristics that it did not have;

b.    Defendants represented to Plaintiff Algofi and the New York Subclass that the Recalled Devices were of a particular standard, quality, or grade when they were actually of another;

    c.   Defendants advertised to Plaintiff Algofi and the New York Subclass goods with intent not to sell them as advertised;

    d.   Defendants engaged in other fraudulent or deceptive conduct creating a likelihood of confusion or misunderstanding; and

    e.   Defendants represented that consumers' purchases of the Recalled Devices conferred or involved rights that the transactions did not have or involve.

138.   Plaintiff Algofi and New York Subclass members suffered damages when they purchased the Recalled Devices. Defendants' unconscionable, deceptive and/or unfair practices caused actual damages to Plaintiff Algofi and New York Subclass members.

139.   Defendants' foregoing deceptive acts and practices, including their omissions, were likely to deceive, and did deceive, consumers acting reasonably under the circumstances.

140.   Plaintiff Algofi reserves the right to allege other violations of the law, which constitute other unlawful business acts and practices. As alleged herein, Defendants continue to misrepresent the Recalled Devices' abilities and continues to deny that the Recalled Devices have the propensity to cause, and have caused, adverse reactions.

141.   Defendants recklessly disregarded Plaintiff Algofi's and New York Subclass members' rights.

142.   Defendants' knowledge of the Recalled Devices' deceptive claims and health and safety risks put it on notice that the Defendants' Recalled Devices were not as it advertised.

143.   In accordance with subsection (h) of section 349, Plaintiff Colon seeks an order enjoining Defendant from continuing these unlawful deceptive acts and practices. Absent enjoining these unlawful deceptive acts and practices, Defendants will continue their false and

misleading marketing of the Recalled Devices and, in doing so, irreparably harm each of the New York Class Members.

144.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Algofi and the New York Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Recalled Devices, and increased time and expense in treating the damage that the Recalled Devices caused.

145.    By reason of the foregoing, Plaintiff Algofi and the New York Subclass Members also seek actual damages or statutory damages of $50 per violation, whichever is greater, as well as punitive damages. N.Y. Gen. Bus. Law § 349(h).

## SIXTH CLAIM FOR RELIEF
### Violation of the New York Deceptive Sales Practice Act
### New York Gen. Bus. Law § 350, et seq.
### (On behalf of the New York Subclass, except for Class Members who purchased a Recalled Device for business use only)

146.    Plaintiff Algofi realleges and reasserts all proceeding factual allegations above as if fully set forth herein.

147.    Plaintiff Algofi brings this cause of action on behalf of himself and the New York Subclass against Defendants for violation of New York General Business Law § 350.

148.    Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 350.

149.    New York General Business Law § 350-a defines "false advertising" as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." N.Y. Gen. Bus. Law § 350-a. The section also provides that advertising can be false by omission, as it

further defines "false advertising" to include "advertising [that] fails to reveal facts material in the light of such representations with respect to the commodity . . . to which the advertising relates." Id.

150.    Defendants' labeling, marketing, and advertising of the Recalled Devices, as alleged herein, are "misleading in a material respect," and are thus "false advertising." As described herein, Defendants repeatedly advertised on its website, on the labels of the Recalled Devices, and through a national advertising campaign, among other items, that the Recalled Devices were safe and fit for human use.

151.    Contrary to these representations, Philips failed to disclose the material information that the PE-PUR Foam used in the Recalled Devices, and therefore the Recalled Devices themselves, were unsafe and unfit for human use.

152.    Defendants had exclusive knowledge of material facts concerning the defective nature of the Recalled Devices, including that they were unsafe and unfit for human use.

153.    Defendants' conduct caused and continues to cause injury to consumers, including Plaintiff Algofi and the New York Subclass members, in that they were misled to believe that they were purchasing Devices that were safe and fit for human use, and did not contain an unsafe Foam that made the Devices themselves unsafe and unfit for human use.

154.    In making and disseminating the false labeling and statements alleged herein, Defendants knew, or should have known, that its practices were materially deceptive and misleading in violation of N.Y. Gen. Bus. Law § 350, et seq.

155.    Plaintiff Algofi and the New York Subclass members based their decision to purchase the Recalled Devices in substantial part on Defendants' labeling, advertisements,

material representations and omitted facts. The revenue to Defendants attributable to the sale of the Recalled Devices likely amount to millions of dollars.

156.    Based on all the foregoing, Defendants have violated New York General Business Law § 350, causing Plaintiff Algofi and the New York Subclass members to sustain injury in fact – the loss of monies paid for the Recalled Devices.

157.    The misrepresentations and non-disclosures by Defendants of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute violations of N.Y. Gen. Bus. Law § 350, et seq.

158.    Plaintiff Algofi seeks an order enjoining Defendants from continuing this false advertising. Absent enjoining this false advertising, Defendants will continue to mislead Plaintiff Algofi and the New York Subclass members and, in doing so, irreparably harm each of the New York Subclass members.

159.    As a direct and proximate result of Defendants' violation of New York General Business Law § 350, Plaintiff Algofi and the New York Subclass members have also suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiff Algofi and the New York Subclass Members also seek actual damages or statutory damages of $500 per violation, whichever is greater, as well as punitive damages. N.Y. Gen. Bus. Law § 350-e (3).

<u>SEVENTH CLAIM FOR RELIEF</u>
**Violation of the Indiana Deceptive Consumer Sales Act, Ind. Code § 23-5, *et seq.***
**(On behalf of the Indiana Subclass, except for Class Members who purchased a Recalled Device for business use only)**

160.    Plaintiff Caswell repeats and realleges all proceeding factual allegations above as if fully set forth herein.

161.    The Indiana Deceptive Consumer Sales Act ("IDCAS") was enacted to "simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales

practices[,]" "protect consumers from suppliers who commit deceptive and unconscionable sales acts[,]" and "encourage the development of fair consumer sales practices." Ind. Code § 24-5-0.5-1(b). The act is intended to be "liberally construed and applied to promote its purposes…." *Id.* at § 24-0.5-5-1(a).

162.    The IDCSA prohibits "deceptive representations as to the subject matter of a consumer transaction," including "[t]hat such a subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonable know that it is not" and that "[t]he consumer will be able to purchase the subject of the consumer transaction as advertised by the supplier, if the supplier does not intend to sell it." *Id.* at § 24-5-0.5-3(a)(1), (11).

163.    Under the IDCSA, a "consumer transaction" means a "sale, lease, assignment, award by chance or other disposition of an item of personal property, real property, [or] a service … to a person for purposes that are primarily personal, familial, charitable, agricultural, or household, or a solicitation to supply any of these things." *Id*. at § 24-5-0.5-2(a)(1).

164.    A person relying on an "uncured or incurable deceptive act may bring an action for damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater." *Id.* at §24-5-0.5-4.

165.    An "uncured deceptive act" means a deceptive act where a consumer who has been damaged by such an act has given notice to the supplier and either (1) no offer to cure has been made to such consumer within 30 days or (2) the action has not been cured as to such consumer within a reasonable time after the consumer's acceptance of the offer to cure.

166.    An "incurable deceptive act" means a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead.

167.     Defendants have committed an "incurable deceptive act" within the meaning of the IDCSA.

168.     Specifically, Defendants knew of the dangers posed by its Recalled Devices, due to user reports sent directly due to Defendants. Defendants, thus, knew that the Recalled Devices posed risks to those who used them.

169.     Defendants, however, did not warn consumers about the dangers of the Recalled Devices when it was alerted to the dangers. Defendants knew that, should it inform customers of the health risks the Recalled Devices pose for individuals who use it, customers would no longer be willing to purchase the product. So, instead, Defendants withheld the dangers of the Recalled Devices, and continued to advertised them as safe CPAP Machines until only April 26, 2021.

170.     The Recalled Devices are not safe. As Defendants knew, the Recalled Devices are associated with significant adverse medical outcomes in a high number of individuals. Those outcomes include headaches, inflammation, irritation, respiratory issues, nausea and vomiting, and exacerbation of allergy responses and symptoms, among other afflictions.

171.     As individuals who purchased the Recalled Devices and experiences an adverse reaction due to the Recalled Devices, Plaintiff Caswell and the Indiana Subclass suffered an injury. All purchasers of the Recalled Devices were injured because they paid a premium for the Recalled Devices that they would not have paid had Defendants disclosed the risks associated with the collar at a much earlier date. Additionally, Plaintiff Caswell and other members of the Class suffered further harm due to the financial and emotional stress of having to seek out further medical attention on new symptoms when, in many cases, the Recalled Devices were already a form of medical attention purchased to alleviate another condition. Defendants acknowledged

those difficulties of treating a troublesome affliction. Here, however, Defendants' product contributed to those difficulties and added more of them.

172.    Plaintiff Caswell and the Indiana Subclass seek all damages and remedies, including equitable relief, allowable under the IDCSA.

## EIGHTH CLAIM FOR RELIEF
### Violation of the California Consumers Legal Remedies Act
### Cal. Civ. Code §§ 1750, *et seq.*
### (On behalf of the California Subclass, except for Class Members who purchased a Recalled Device for business use only)

173.    Plaintiff Reid repeats and realleges all proceeding factual allegations above as if fully set forth herein.

174.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

175.    Defendants' false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Recalled Devices for personal, family, or household purposes by Plaintiff Flores and Class Members, and violated and continue to violate the following sections of the CLRA:

> a. § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;
>
> b. § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;
>
> c. § 1770(a)(9): advertising goods with intent not to sell them as advertised; and
>
> d. § 1770(a)(16): representing the subject of a transaction has been

supplied in accordance with a previous representation when it has not.

176. Defendants profited from the sale of the falsely, deceptively, and unlawfully advertised Recalled Devices to unwary consumers.

177. Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

178. Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiff will send a CLRA Notice letter to Defendants concurrently with the filing of this action or shortly thereafter, which details the violations of the CLRA, demands correction of these violations, and provides the opportunity to correct these business practices.

179. If Defendants do not correct their business practices, Plaintiffs will amend or seek leave to amend the complaint to add claims for monetary relief, including restitution and actual damages under the CLRA.

180. Pursuant to California Civil Code § 1780, Plaintiff Reid seeks injunctive relief, and any other relief that the Court deems proper.

**NINTH CLAIM FOR RELIEF**
**Violation of the California False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500, et seq.**
**(On behalf of the California Subclass, except for Class Members who purchased a**
**Recalled Device for business use only)**

181. Plaintiff Reid repeats and realleges all proceeding factual allegations above as if fully set forth herein.

182. The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

183.    It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Id.

184.    As alleged herein, the advertisements, labeling, policies, acts, and practices of Defendants relating to the Recalled Devices misled consumers acting reasonably as to the safety and fitness for human use of the Recalled Devices.

185.    Plaintiff Reid suffered injury in fact as a result of Defendants' actions as set forth herein because he purchased the Recalled Devices in reliance on Defendants' false and misleading labeling claims that the Recalled Devices, among other things, are safe and fit for human use.

186.    Defendants' business practices as alleged herein constitute deceptive, untrue, and misleading advertising pursuant to the FAL because Defendants have advertised the Recalled Devices in a manner that is untrue and misleading, which Defendants knew or reasonably should have known, and omitted material information from its advertising.

187.    Defendants profited from their sale of the falsely and deceptively advertised Recalled Devices to unwary consumers.

188.    As a result, Plaintiff Reid, the California Subclass members, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

189.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff Reid, on behalf of herself and the California Subclass, seeks an order enjoining Defendants from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

**TENTH CLAIM**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, et seq.**
**Unlawful, Unfair, and Fraudulent Prongs**
**(On behalf of the California Subclass, except for Class Members who purchased a**
**Recalled Device for business use only)**

190.    Plaintiff Reid repeats and realleges all proceeding factual allegations above as if fully set forth herein.

191.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

192.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as alleged herein constitute business acts and practices.

193.    Unlawful: The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

        a. The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq.; and

        b. The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 et seq.

194.    Unfair: Defendants' conduct with respect to the labeling, advertising, and sale of the Recalled Devices was "unfair" because Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to their victims.

195.    Defendants' conduct with respect to the labeling, advertising, and sale of the Recalled Devices was and is also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not limited to the applicable sections of the Consumers Legal Remedies Act and the False Advertising Law.

196.    Defendants' conduct with respect to the labeling, advertising, and sale of the Recalled Devices was and is unfair because the consumer injury was substantial, not outweighed

by benefits to consumers or competition, and not one consumer themselves could reasonably have avoided.

197.    Fraudulent: A statement or practice is "fraudulent" under the UCL if it is likely to mislead or deceive the public, applying an objective reasonable consumer test.

198.    As set forth herein, Defendants' claims relating the representations stated on the Recalled Devices' labeling and advertising, and moreover that the Recalled Devices are labeled as safe and fit for human use mislead reasonable consumers to believe the Recalled Devices are safe and fit for human use.

199.    Defendants profited from its sale of the falsely, deceptively, and unlawfully advertised Recalled Devices to unwary consumers.

200.    Plaintiff Reid and California Subclass members are likely to continue to be damaged by Defendants' deceptive trade practices, because Defendants continue to disseminate misleading information on the Recalled Devices' packaging. Thus, injunctive relief enjoining Defendants' deceptive practices is proper.

201.    Defendants' conduct caused and continues to cause substantial injury to Plaintiff Reid and the other California Subclass members. Plaintiff Reid has suffered injury in fact as a result of Defendants' unlawful conduct.

202.    In accordance with Bus. & Prof. Code § 17203, Plaintiff Reid seeks an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

203.    Plaintiff Reid and the Class also seek an order for and restitution of all monies from the sale of the Recalled Devices, which were unjustly acquired through acts of unlawful competition.

**ELEVENTH CLAIM FOR RELIEF**
**Violation of the Alabama Deceptive Trade Practices Act**
**Code of Ala. §§ 8-19-1, *et seq.***
**(On behalf of the Alabama Subclass, except for Class Members who purchased a Recalled**
**Device for business use only)**

204.    Plaintiff Jerome reasserts and realleges all proceeding factual allegations above as if fully set forth herein.

205.    Plaintiff Jerome brings this Count against Defendants individually and on behalf of members of the Alabama Subclass.

206.    Defendants' manufacture, sale, and distribution of the Recalled Devices, and Plaintiff Jerome's and Alabama Subclass Members' purchase of the Recalled Devices, was a sale or distribution of goods to a consumer within the meaning of the Alabama Deceptive Trade Practices Act.

207.    Plaintiff Jerome and Alabama Subclass Members purchased Defendants' defective and misrepresented goods for personal, family, or household use.

208.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Recalled Devices or the PE-PUR Foam within them as described herein and otherwise engaged in the following unlawful and deceptive acts or practices in the conduct of trade or commerce:

a.    Represented that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have;

b.    Represented that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

c.    Engaged in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

209.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of material facts with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Recalled Devices.

210.    As alleged above, Defendants knew or should have known of the unsafe nature of the Recalled Devices, through its design and development of the Recalled Devices and user reports.

211.    By failing to disclose and by actively concealing the safety concerns of the PE-PUR Foam in the Recalled Devices and thereby the Recalled Devices themselves, by marketing them as safe and fit for human use, Defendants engaged in unlawful or deceptive business practices in violation of the Alabama Deceptive Trade Practices Act. Defendants deliberately withheld the information about the propensity of the PE-PUR Foam and the Recalled Devices themselves to cause adverse reactions in individual users.

212.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues of the Recalled Devices. Defendants compounded the deception by repeatedly asserting that the Recalled Devices were safe and fit for human use.

213.    Defendants intentionally and knowingly misrepresented material facts regarding the Recalled Devices with an intent to mislead Plaintiff Jerome and the Alabama Subclass members.

214.    As alleged above, Defendants made material statements about the safety of the Recalled Devices that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Recalled Devices as safe

and fit for human use, despite their knowledge of the dangers of PE-PUR Foam or their failure to reasonably investigate it.

215.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Recalled Devices and their debilitating consequences, and allowed unsuspecting sleep apnea patients and others to continue to buy the Recalled Devices, and allowed them to continue using these dangerous devices.

216.    Defendants owed Plaintiff and the Alabama Subclass members a duty to disclose the true safety and fitness for human use of the Recalled Devices because Defendants:

    a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b.    Intentionally concealed the foregoing from Plaintiff and the Alabama Subclass members; and/or

    c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff and the Alabama Subclass members that contradicted these representations.

217.    Because Defendants fraudulently concealed the danger of the PE-PUR Foam and dangerous propensity of the Recalled Devices, the value of the Recalled Devices was greatly lower than what Plaintiff Jerome and the Alabama Subclass members paid for them.

218.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the PE-PUR Foam and the Recalled Devices were material to Plaintiff and the Alabama Subclass members.

219.    Plaintiff and the Alabama Subclass members suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the dangerous propensity of the PE-PUR Foam used in the Recalled Devices and the

Recalled Devices as a whole, and Defendants' complete disregard for safety, Plaintiff Jerome

and the Alabama Subclass members either would have paid less for their Devices or would not

have purchased them at all. Plaintiff Jerome and the Alabama Subclass members did not receive

the benefit of their bargain as a result of Defendants' misconduct.

220.    Plaintiff Jerome and the Alabama Subclass members risk irreparable injury as a

result of Defendants' acts and omissions in violation of the Alabama Deceptive Trade Practices

Act, and these violations present a continuing risk to Plaintiff, the Alabama Subclass members,

as well as to the general public. Defendants' unlawful acts and practices complained of herein

affect the public interest.

221.    As a direct and proximate result of Defendants' violations of the Alabama

Deceptive Trade Practices Act, Plaintiff Jerome and the Alabama Subclass members have

suffered injury-in-fact and/or actual damages.

222.    Plaintiff Jerome and the Alabama Subclass members also seek an order enjoining

Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and

any other just and proper relief available under the Alabama Deceptive Trade Practices Act.

223.    WHEREFORE Plaintiff Jerome and the Alabama Subclass members seek full

compensatory and consequential damages allowable by law, appropriate equitable relief

including injunctive relief, a declaratory judgment, a court order enjoining Defendants' wrongful

acts and practices, restitution, attorney's fees and costs on behalf of the class, and any other relief

to which Plaintiff and the Alabama Subclass members may be entitled.

<u>TWELFTH CLAIM FOR RELIEF</u>
**Violation of the Missouri Merchandising Practices Act**
**Mo. Rev. Stat. §§ 407.010, *et seq.***
**(On behalf of the Missouri Subclass, except for Class Members who purchased a**
**Recalled Device for business use only)**

224.    Plaintiff Malcolm reasserts and realleges all proceeding factual allegations above as if fully set forth herein.

225.    Plaintiff Malcolm brings this claim on behalf of herself and the Missouri Subclass members for violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq.*

226.    Defendants are "persons" as defined by Mo. Rev. Stat. §407.010(5).

227.    Defendants advertised, offered, or sold goods or services in Missouri and engaged in trade or commerce directly or indirectly affecting the people of Missouri, as defined by Mo. Rev. Stat. § 407.010(4), (6) and (7).

228.    Plaintiff Malcolm and Missouri Subclass members purchased goods primarily for personal, family, or household purposes.

229.    Defendants engaged in unlawful, unfair, and deceptive acts and practices, in connection with the sale or advertisement of merchandise in trade or commerce, in violation of Mo. Rev. Stat. § 407.020(1), as described herein.

230.    As described herein, Defendants repeatedly advertised, both on the Recalled Device labels and on its website, through a national advertising campaign, among other items, that the Recalled Devices are safe and fit for human use.

231.    Contrary to these representations, the Recalled Devices are not safe and fit for human use as described on the Recalled Device labels or in Defendants' uniform marketing and advertising campaign. Rather, the Recalled Devices are defective because they contain an unsafe

Foam, PE-PUR Foam, that is unsafe and unfit for human use thereby rendering the Recalled Devices themselves unsafe and unfit for human use as marketed by Defendant.

232.    Defendant had exclusive knowledge of material facts concerning the defective nature of the Recalled Devices, including that they had the propensity to cause, and had caused these adverse reactions.

233.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

234.    Defendants recklessly disregarded Plaintiff Malcolm's and Missouri Subclass members' rights.

235.    Defendants' knowledge of the Defendants' Recalled Devices' abilities and safety and health risk put them on notice that Defendants' Recalled Devices were not as they advertised.

236.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Malcolm and Missouri Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing Defendant's Recalled Devices, and increased time and expense in treating the damages caused by the Recalled Devices.

237.    Plaintiff Malcolm and Missouri Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, punitive damages, attorneys' fees and costs, declaratory relief, and any other appropriate relief.

## THIRTEENTH CLAIM FOR RELIEF
### Violation of the Maryland Consumer Protection Act
### Md. Comm. Code §§ 13-301, *et seq.*
### (On behalf of the Maryland Subclass, except for Class Members who purchased a Recalled Device for business use only)

238.    Plaintiff Ekweozoh reasserts and realleges all proceeding factual allegations above as if fully set forth herein.

239.    Plaintiff Ekweozoh brings this claim on behalf of themselves and the Maryland Subclass members.

240.    Defendants are persons as defined by Md. Comm. Code § 13-101(h).

241.    Defendants' conduct as alleged herein related to "sales," "offers for sale," or "bailment" as defined by Md. Comm. Code § 13-101(i) and § 13-303.

242.    Maryland Subclass members are "consumers" as defined by Md. Comm. Code § 13-101(c).

243.    Defendants advertise, offer, or sell "consumer goods or "consumer services" as defined by Md. Comm. Code § 13-101(d).

244.    Defendants advertised, offered, or sold goods or services in Maryland and engaged in trade or commerce directly or indirectly affecting the people of Maryland.

245.    Defendants engaged in unfair and deceptive trade practices, in violation of Md. Comm. Code § 13-301, including:

   a.   False or misleading oral or written representations that have the capacity, tendency, or effect of deceiving or misleading consumers;

   b.   Representing that consumer goods or services have a characteristic that they do not have;

    c.    Representing that consumer goods or services are of a particular standard, quality, or grade that they are not;

    d.    Failing to state a material fact where the failure deceives or tends to deceive;

    e.    Advertising or offering consumer goods or services without intent to sell, lease, or rent them as advertised or offer; and

    f.    Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion or sale of consumer goods or services of the subsequent performance with respect to an agreement, sale, lease, or rental.

246.    Defendants engaged in these unfair and deceptive trade practices in connection with offering for sale or selling consumer goods or services or with respect to the extension of consumer credit, in violation of Md. Comm. Code § 13-303.

247.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

248.    Defendants intended to mislead Plaintiff Ekweozoh and the Maryland Subclass members and induce them to rely on its misrepresentations and omissions.

249.    Defendants should have disclosed the dangerous propensity of PE-PUR Foam and the Recalled Devices to Plaintiff Ekweozoh and the Maryland Subclass members because they were in a superior position to know the true facts related to that dangerous propensity, and Plaintiff Ekweozoh and Maryland Subclass members could not reasonably be expected to learn or discover the true facts related to this dangerous propensity.

250.    Defendants, by the conduct, statements, and omissions described above, also knowingly and intentionally concealed from Plaintiff Ekweozoh and the Maryland Subclass members that the Recalled Devices are unsafe and unfit for human use.

251.    These acts and practices have deceived Plaintiff Ekweozoh and are likely to deceive the public. Defendants, by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff Ekweozoh and the Maryland Sublass members that the Recalled Devices are unsafe and unfit for human use, breached their duties to disclose these facts, violated the MCPA, and caused injuries to Plaintiff Ekweozoh and the Maryland Subclass members. The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiff Ekweozoh and Maryland Subclass members, as it would have been to all reasonable consumers.

252.    The injuries suffered by Plaintiff Ekweozoh and the Maryland Subclass members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff Ekweozoh and the Maryland Subclass members should have reasonably avoided.

253.    Defendants' conduct proximately caused injuries to Plaintiff Ekweozoh and other Maryland Subclass members. Had Plaintiff Ekweozoh and the Maryland Subclass members known about the defective nature of the Recalled Devices, they would not have purchased the Recalled Devices, would have paid less for them or would have avoided the extensive repair costs associated therewith.

254.    Plaintiff Ekweozoh and the Maryland Subclass members seek all monetary and non- monetary relief allowed by law, including damages, disgorgement, injunctive relief, and attorneys' fees and costs.

## FOURTEENTH CLAIM FOR RELIEF
**VIOLATION OF 73 Pa. C.S.A. § 201-I, *et seq*., PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW AND REQUEST FOR INJUNCTIVE RELIEF**
**(On behalf of the Pennsylvania Subclass, except for Class Members who purchased a Recalled Device for business use only)**

255.    Plaintiffs Lint and Clawson incorporate the foregoing allegations as if fully set forth herein.

256.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") protects consumers against "unfair or deceptive acts or practices" in connection with the sale or advertisement of any merchandise. 73 Pa. C.S.A. § 201-1, et seq.

257.    Plaintiffs Lint and Clawson and the Pennsylvania Subclass members are consumers who purchased affected Philips CPAP machines from Defendant and did so primarily for personal, family, or household purposes within the meaning of *73 Pa. C.S.A. § 201-9.2.*

258.    Defendants used and employed unfair methods of competition and/or unfair or deceptive acts or practices within the meaning of *73 Pa. C.S.A. §§ 201-2* and *201-3*. Such unfair methods of competition and/or unfair or deceptive acts or practices include, but are not limited to the following:

    a.  Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another (201-2(4)(vii));

    b.  Advertising goods or services with intent not to sell them as advertised (201-2(4)(ix));

    c.  Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made (201-2(4)(xiv)); and

    d.  Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding (201-2(4)(xxi));

259.    Plaintiffs Lint and Clawson and the Pennsylvania Subclass members relied on Defendants' unfair methods of competition and/or unfair or deceptive acts or practices as set forth herein.

260.    Defendants' unfair methods of competition and/or unfair or deceptive acts or practices did deceive Plaintiffs Lint and Clawson and the Pennsylvania Subclass members who were, at all times relevant hereto, acting reasonably under the circumstances.

261.    Plaintiffs Lint and Clawson and the Pennsylvania Subclass members justifiably relied on Defendant's unfair methods of competition and/or unfair or deceptive acts or practices, as set forth herein, and they suffered ascertainable losses as set forth herein.

262.    Plaintiffs Lint and Clawson and the Pennsylvania Subclass members would not have purchased or used the affected CPAP machines had Defendants' not engaged in prohibited unfair methods of competition and/or unfair or deceptive acts or practices, as set forth herein.

263.    Defendants knew or should have known that the affected CPAP machines were not being sold as warranted, guaranteed, and/or represented by Defendants.

264.    Defendants' concealments, omissions, deceptions, and conduct were and are likely to deceive and likely to cause misunderstanding and did cause Plaintiffs Lint and Clawson and the Pennsylvania Subclass members to be deceived.

265.    Defendants intended that Plaintiffs Lint and Clawson and the Pennsylvania Subclass members would rely on its misrepresentations, concealment, warranties, guarantees, deceptions, and/or omissions as discussed herein.

266.    Plaintiffs Lint and Clawson and the Pennsylvania Subclass members have been damaged as a result of Defendant's violations of the UTPCPL and have suffered actual, ascertainable losses by Defendants' sale of the affected CPAP machines.

267.    Defendants have engaged in unfair, unlawful, and deceptive acts in trade and commerce which have the capacity and tendency to deceive and, in fact, did deceive Plaintiffs Lint and Clawson and the Pennsylvania Subclass members and damaged Plaintiffs Lint and Clawson and the Pennsylvania Subclass members.

268.    Defendants committed unlawful, deceptive, and unconscionable trade practice by selling Plaintiffs Lint and Clawson and the Pennsylvania Subclass members affected CPAP machines.

269.    Defendants' misrepresentations and omissions misled Plaintiffs Lint and Clawson and the Pennsylvania Subclass members into believing that the affected CPAP machines were safe for their intended use/purposes when they were not.

270.    Because of Defendant's unlawful, deceptive, unfair, and unconscionable trade practice and scheme, Plaintiffs Lint and Clawson and the Pennsylvania Subclass members have suffered injuries and damages in an amount to be determined at trial.

271.    As a direct and proximate result of Defendants' violations of the UTPCPL as set forth above, Plaintiffs Lint and Clawson and the Pennsylvania Subclass members have suffered ascertainable losses of money and are therefore entitled to relief, including damages, plus triple damages, and attorney's fees and costs.

## FIFTEENTH CLAIM FOR RELIEF
### MEDICAL MONITORING
**(on behalf of the Nationwide Class, or alternatively, the Subclasses, except for Class Members who purchased a Recalled Device for business use only)**

272.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

273.    At all relevant times, the Defendants designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed the Recalled Devices into the stream of commerce, and

therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff.

274.    Defendants have reported that users of the Recalled Devices face risks of serious injury from the degradation of PE-PUR Foam contained in the Recalled Devices. Degradation of PE-PUR Foam may be caused by exposure to chemical emissions from the foam material, high heat and high humidity environments in certain regions, and cleaning methods such as ozone may accelerate potential degradation.

275.    When PE-PUR Foam degrades into particles that may enter the device's pathway and be ingested or inhaled by users of the devices, users face significantly increased risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of degraded foam exposure include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects.

276.    The off-gassing of chemicals from the PE-PUR Foam contained in the Recalled Devices poses risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of exposure to off-gassing from PE-PUR Foam include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

277.    The absence of visible particles does not mean that PE-PUR Foam breakdown has not already begun. Philips has reported that lab analysis of the degraded foam reveals the presence of harmful chemicals including: TDA, TDI, and DEG.[20] TDI is a powerful irritant to

---

[20] Philips Sleep and Respiratory Care Update; Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed June 27, 2021).

the mucous membranes of the eyes and gastrointestinal and respiratory tracts,[21] and has been reported to cause Occupational Asthma.[22] Exposure to TDA may result in ataxia, tachycardia, nausea, vomiting, convulsions, and respiratory depression.[23] TDA can cause chemical cyanosis (*i.e.*, bluish discoloration of the skin) by converting hemoglobin to methemoglobin. This compound can also cause fatty degeneration of the liver.[24] TDA and TDI are potential carcinogens.[25] Repeated exposure to DEG has been associated with damage to the kidneys and renal failure.[26]

278.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been exposed to substantially increased risks of serious injury from off-gassing and/or degradation of PE-PUR Foam in the Recalled Devices, which is beyond normal background levels of risk.

---

[21] The National Institute for Occupational Safety and Health (NIOSH) Current Intelligence Bulletin 53, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*, DHHS (NIOSH) Publication Number 90-101 (Dec. 1989); *see also* Gunnar Skarping, *et al.*, *Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*, Dep't of Occupational and Environmental Medicine, University Hospital, S-221 85 Lund, Sweden (1990); https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/.

[22] Bernstein, David I, *Occupational asthma: Definitions, epidemiology, causes, and risk factors*, Wolters Kluwer, UpToDate.com (accessed Jun. 30, 2021).

[23] NIOSH, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*; *see also* Skarping, *Biological monitoring of isocyanates and related amines: Test chamber exposure of humans to toluene diisocyanate*; https://greenfuture.io/sustainable-living/spray-polyurethane-foam-toxic/.

[24] NIOSH, *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity.*

[25] *Id.* ("The excess cancer risk for workers exposed to TDI and TDA has not yet been quantified, but the probability of developing cancer should be decreased by minimizing exposure.").

[26] Greg M. Landry, *Diethylene glycol-induced toxicities show marked threshold dose response in rats*, Toxicology and Applied Pharmacology 282 (2015) 244-251 ("DEG has recently been involved in several mass epidemics of renal failure and death world-wide (O'Brien et al., 1998; Schier et al., 2013). DEG poisoning clinically manifests in metabolic acidosis, hepatotoxicity, renal failure, and peripheral neuropathy, with the hallmark being acute renal failure involving proximal tubule cell necrosis and cortical degeneration (Schep et al., 2009)"); Cohen, Jeffrey A., *Demyelinating Diseases of the Peripheral Nerves*, Nerves and Nerve Injuries (2015) ("When consumed, DEG causes severe systemic and neurologic complications, including coma, seizures, peripheral neuropathy, and hepatorenal failure.").

279.    As a direct and proximate result of Defendants' conduct, Plaintiffs have a significantly increased risk of suffering serious injury or contracting a serious latent disease, and suffering further injury at an unknown date in the future. Such injuries include cancer and organ failure, among others currently unknown or just being discovered.

280.    Monitoring procedures exist that makes the early detection of damage from degraded and/or off-gassed PE-PUR Foam possible. These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

281.    Existing medical research indicates that exposure to TDI, TDA, and DEG, which Philips has found to exist in off-gassed or degraded PE-PUR Foam, can cause serious, life-threatening and permanent injuries. Philips has received reports from users of the Recalled Devices of headache, upper airway irritation, cough, chest pressure and sinus infection. The exposure to the defects inherent in the Recalled Devices has occurred for users, such as Plaintiffs, but the full extent of the injuries will not manifest until later in the Plaintiffs' life. Thus, because of Defendants' conduct, it is reasonably necessary that Plaintiffs be placed under period diagnostic testing beyond that normally recommended in the absence of use of the Recalled Devices.

282.    Plaintiffs demand judgment against Defendants for medical monitoring damages to diagnose injuries caused by the Recalled Devices at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Philips as to each and every count, including:

A.    An order certifying this action and the Class and Subclasses requested herein as a class action, designating Plaintiffs as the representatives of the Class and Subclasses, and appointing Plaintiffs' counsel as counsel to the Class and Subclasses;

B.    An order declaring that Philips' actions constitute: (i) breach of express warranty; (ii) breach of the implied warranty of merchantability; (iii) fraudulent misrepresentation; (iv) fraud by omission; (v) negligent misrepresentation; and (vi) violations of the consumer protection statutes invoked herein, and that Philips is liable to Plaintiffs and the Class and Subclasses, as described herein, for damages arising therefrom;

C.    A judgment awarding Plaintiffs and members of the Class and Subclasses all appropriate damages in an amount to be determined at trial;

D.    A judgment awarding Plaintiffs and the Class and Subclasses medical monitoring damages;

E.    A judgment awarding Plaintiffs and the Class and Subclasses prejudgment and post-judgment interest, as permitted by law;

F.    A judgment awarding Plaintiffs and the Class and Subclasses costs and fees, including attorneys' fees, as permitted by law; and

H.    Grant such other legal, equitable or further relief as the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury for all issues so triable.

DATED: July 13, 2021                    Respectfully submitted,

                                        <u>/s/Jason M. Leviton</u>
                                        Jason M. Leviton
                                        **BLOCK & LEVITON LLP**
                                        260 Franklin Street, Suite 1860
                                        Boston, MA 02110
                                        T: 617-398-5600
                                        F: 617-507-6020
                                        jason@blockleviton.com

                                        Gary E. Mason*
                                        **MASON, LEITZ, & KLINGER LLP**
                                        5101 Wisconsin Avenue NW, Suite 305
                                        Washington, D.C. 20016
                                        T: (202) 429-2290
                                        F: (202) 429-2294
                                        gmason@masonllp.com

                                        Gary M. Klinger*
                                        **MASON, LEITZ, & KLINGER LLP**
                                        227 W. Monroe Street, Suite 2100
                                        Chicago, IL 60606
                                        T: (202) 429-2290
                                        gklinger@masonllp.com

                                        Jonathan Shub*
                                        Kevin Laukaitis*
                                        **SHUB LAW FIRM LLC**
                                        134 Kings Hwy E., Fl. 2
                                        Haddonfield, NJ 08033
                                        T: 856-772-7200
                                        jshub@shublawyers.com
                                        klaukaitis@shublawyers.com

Troy M. Frederick*
Beth A. Frederick*
**FREDERICK LAW GROUP, PLLC**
836 Philadelphia Street
Indiana, PA 15701
Telephone: (724) 801-8555
Fax: (724) 801-8358
*TMF@FrederickLG.com*
*BAF@FrederickLG.com*

*Pro Hac Vice Application Forthcoming

*Attorneys for Plaintiffs and the Classes*